We will hear argument this morning in Case 20-5904, Terry v. United States. Mr. Adler? Mr. Chief Justice, and may it please the Court, the United States agrees that crack offenders sentenced under B-1C have a covered offense under Section 404. Statutory text, history, and common sense all compel that conclusion. The textual dispute here boils down to whether Section 2 modified the statutory penalties for petitioner's crack offense. It did. Because B-1C cross-references B-1A and B, when Section 2 raised the crack quantities for B-1A and B, Section 2 also modified B-1C. That modification expanded the scope of conduct subject only to B-1C, and it changed the sentencing benchmarks by which B-1C offenses are measured. Unable to dispute that modification, amicus argues that the phrase statutory penalties means a sentencing range. But Section 2 did not modify any sentencing ranges at all. It merely raised the crack quantities, and Congress knew that. History confirms that B-1C offenses are covered. Shortly after enacting Section 2, Congress approved the Sentencing Commission's decision to incorporate Section 2 into the guidelines for all crack offenders, including B-1C offenders. And in the eight years leading up to Section 404, the Commission repeatedly used the phrase statutory penalties to refer to the higher crack quantities, not lower sentencing ranges. Finally, amicus's contrary interpretation would make little sense. It would cover kilogram trafficking kingpins, but exclude the lowest-level dealers. He has failed to offer any coherent explanation for why Congress would have done that. After all, Congress did not enact bipartisan criminal justice reform to create new anomalies. It enacted Section 404 to purge the taint of the discredited 100-to-1 disparity. To do that, it gave all crack offenders sentenced under that old regime an opportunity to seek a reduced sentence under Section 2's new statutory benchmarks. I welcome the Court's questions. Counsel, if we extend the First Step Act into Subsection C, as you argue we should, because you're concerned about the crack cocaine disparity, but wouldn't that also extend to other drugs? Because Subsection C covers the waterfront. It's not just a crack cocaine provision. No, Mr. Chief Justice, because Sections 2 and 3 modified the statutory penalties only for crack cocaine violations. The penalties remain exactly the same for every other drug. And Congress, of course, knew that when it was drafting Section 404. It knew that Sections 2 and 3 were only about crack cocaine, and that was the purpose of Section 404 was to just make those two provisions retroactive. And so that wouldn't have even been on Congress's radar when it was drafting Section 404. And, of course, we have to keep in mind the overall statutory scheme and structure and context here when we're interpreting Section 404. And, of course, crack cocaine is part of the element of the offense under B1C. And so I just don't think that's a realistic concern here. And, in fact, no court in the country has granted Section 404 relief to a non-crack offender. And no court in the country will do so if the court rules in our favor here. Well, you say that's what Congress had in mind, but do you think the statutory language is unambiguous in that respect? We do. We do, Mr. Chief Justice, because if you look at 404A, the statutory penalties for which were modified by Section 2 or 3, that is only referring to crack cocaine violations of 841 and 960, nothing else. So it's just not something that is going to happen if the court rules in our favor in this case. What's the practical need to apply the First Step Act into Subsection C given the retroactive sentencing guidelines? Because, Mr. Chief Justice, many people, many B1C offenders, like many B1A and B offenders, did not receive the benefit of the retroactive guideline amendments. If they were career offenders or on career criminals, they never got any benefit from Amendment 750. There are people with certain quantities that never received any benefit at all. And then there are people who were eligible for relief under Amendment 750, but were limited dramatically in the scope of relief that they could get by the low end of the amended guideline range. And they were all, of course, subject to the old statutory benchmarks. The quantities in the statute at the time of Amendment 750 were still 5 and 50 grams as opposed to 28 and 280 grams. And that's certainly something that a sentencing court could look at today and think that the person's offense was, in fact, less serious today than it was when it was considering a reduction under Amendment 750. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, just so that I'm clear, I'm going to just make a brief statement and ask you where I'm wrong. Petitioner was convicted of possessing an unspecified amount of crack with the intent to distribute. And before 2010, the statutory penalty was 0 to 20 years for this offense. After 2010, the statutory penalty is still 0 to 20 years. As far as I can see, then, the statutory penalty for Petitioner here was not modified. Tell me where I'm wrong here. Yes, Justice Thomas. The phrase statutory penalties in the context of this particular statute does not refer to the sentencing range of 0 to 20 years. Read in context, it means the penalty statutes that were actually modified by Section 2. So if we look at the language of 404A, we see it's statutory penalties for which, quote, were modified by Section 2. So Congress is incorporating Section 2 directly into 404A and the penalties it modified. So then if we look at what Section 2 actually did, it raised the quantities. That's it. In two statutes, 841B and 960B, both of those statutes are entitled penalties. Section 3 did the same thing for a penalty provision in 844A. It struck that provision. 844A is also entitled penalties. Statutory penalties is just a shorthand reference for the penalty statutes that Sections 2 and 3 modified, not the sentencing ranges that went completely undisturbed. And if Congress meant statutory penalties to refer to a sentencing range, well, then it would have simply said a statutory. Would you give me then an example of a person who would have been convicted or was convicted under subparagraph C before 2010 and how that same person would face a different statutory penalty now? Yes, Justice Thomas. They would face the same sentencing range, but the benchmarks governing the discretionary sentencing determination would be different. So take Mr. Terry, who has four grams of crack. Before Section 2, he was four-fifths of the way to the five-year mandatory minimum. After Section 2, he would be four-twenty-eighths or one-seventh of the way to that mandatory minimum. And that's certainly something that the sentencing judge could look at and consider under 3553A and decide that his offense was actually less serious than was previously believed. Thank you. Justice Breyer? We all have the same question, I guess. Mine is the same as Justice Thomas and the Chief Justice. Let me try to put it less accurately than they did and simpler and directly. Look, the ratio between crack and ordinary cocaine was ridiculous. A hundred to one or something. So Congress finally got around to modifying that. Fine. And anybody who's been sentenced under the old range, go back and get resentenced. Fine. The problem is, what has this section got to do with it? C. Because this section seems to have nothing whatsoever to do with that ratio. It punishes people for 20 years or for 30 years if they commit a felony, for example, of any drug, Schedule I, Schedule II, plus two others, any of those drugs with intent to distribute it. It had nothing to do with the ratio. And if you look at the guideline, which was Level 34 for a career criminal category 6, that had nothing to do with it. That not only picks up all the people who twice committed that felony, the crack one, and also people who twice committed many forms of robbery and twice committed. So if you win this case, I don't see what's to prevent any person, any person, certainly who convicted of any drug felony, career criminal, from going out and asking, Judge, resentence me. Now, that's the practical problem I have, as well as the language not really applying. Get me out of this. I'd love to get out of it. I mean, I think they were much too high. I understand that. But I can't get away from this statute. So you convince me, I hope, that I'm wrong. Justice Breyer, let me try to make two points there. First, the 100 to 1 ratio affected everyone who was sentenced under that regime. Whether it affected their statutory range or guideline range or not, it still affected the discretionary sentencing determination under 3553A because it provided the frame of reference through which judges assess the severity of the offense. After all, the quantities in the statute reflected Congress' judgment about how much crack was needed to justify a five- and ten-year mandatory minimum sentence. As for the language, as I was attempting to explain to Justice Thomas, statutory penalties doesn't mean the sentence… I know your argument on the language. And I suspect you're right about that, about how the mentality of the judge within his leeway was different. Certainly, it couldn't have been different from a career criminal. He would have had to depart. He would have had to depart there. And I don't know if it affected that or not. But if we read it your way, I don't see how we get out of the fact that it really covers every drug offender who has two or three prior felonies or not. It's covering everybody. The chief was right. And so maybe you could say they shouldn't. I agree with you. They shouldn't. But I have to look at the statute and see what it did to help convince me. Justice Breyer, the only people who are eligible who have a covered offense are crack offenders. That's it. There's no dispute about that. I'll say that. You're reading it to say any statutory provision that covers the mandatory minimum part of the crack offense. Sure. This is a statutory provision that covers it. And then it says if you were sentenced under such a statutory provision, go and ask for a resentencing. And by the way, amphetamine or whatever you call it, an ordinary cocaine offense was sentenced under that statute. Justice Breyer, Sections 2 and 3 of the Fair Sentencing Act modified the statutory penalties only for crack cocaine violations, and that's it. Justice Alito. What does the clause, the statutory penalties for which were modified by Section 2 or 3 of the Fair Sentencing Act modify? Does it modify violation or does it modify statute? Justice Alito, we agree with Amicus and the government that it refers to the full and appraised violation of a federal criminal statute. We all agree on that point. So that means it modifies violation. Violation there is the noun, right? Yes, we view it as a concise and integrated phrase, so it's one phrase, violation of a federal criminal statute. We agree with that. But the violation is a case that could be prosecuted under Subsection C, is it not? We agree that the federal criminal statute here refers to 841A and B1C. Right. It is an offense that could be prosecuted under 841 and Subsection C. Yes, we agree with that. We all agree with that, I believe. If I asked you what is the statutory penalty for, let's say, bank robbery or wire fraud or any other violation of a criminal statute, what would you tell me and where would you look to find the answer? I would look to the penalty statute for that particular offense. In this case, the penalty statute for Petitioner's Crack Offense is in 841B1C. And that is the penalty statute that was modified by Section 2 because the scope has been enlarged. Before Section 2, it only covered offenses exclusively between 0 and 5 grams. After Section 2, that's gone from 0 to 28. So the scope of the penalty statute has been enlarged. Now, it may be that the phrase statutory penalty is used in other contexts or used in isolation might refer to a term of years. But in this particular context, it doesn't mean that. Well, in every other criminal statute, doesn't it refer to the term of years or whatever other penalty is prescribed that one would find in the statutory text itself? Isn't that the statutory penalty? Justice Alito, it would depend on the context. And this context here includes the word modified, not the word reduced, which is what we would expect to find if we're talking about lower ranges. Of course, Congress could have simply said amended. That would have covered B1A and B, but excluded B1C. That would have been the easiest way. Well, I'm not talking about modified, amended, or any other adjective like that. I'm just looking at the term statutory penalty. Justice Alito, then I would direct you to the Sentencing Commission for the eight years leading up to Section 404 in this context. Use that phrase to refer to the higher craft quantities, not to sentencing ranges. It means something different with respect to subsection C than it does with respect to every other provision of the Federal Criminal Code. It has a particular meaning in this particular context, in the context of Section 2, because Section 2 didn't change any sentencing ranges at all for any of the three tiers. All it did was raise the quantities. Justice Sotomayor? Counsel, when I think of this case and the difficulties with your argument, I simplify it in a different way, okay? Pre-Act, if I sold 5.5 grams of coke, I was in Subdivision B, and I had a minimum that was five to 40 years. After the Fair Sentencing Act, I had a range of zero to 20 years. And I don't think there's any dispute that after the Fair Sentencing Act, because I was in Subcategory B, I could move to be resentenced, correct? That's correct. However, if I was in Subcategory C before the Act, if I sold anything less than 5 grams, my sentencing range was zero to 20 years. And after the Fair Sentencing Act, if I sold less than 5 grams, I was still in a sentencing range of zero to 20 years. My sentencing range for anything that was covered before the Fair Sentencing Act or after the Fair Sentencing Act remains the same. That's your adversary's position. And I think what he says is, only those people who received a sentence or who sold crack above 5.1 are eligible for reductions, because they're the only ones for whom the penalties changed. And you told the Chief your reading was unambiguous, but I don't think so. And if it is ambiguous, why isn't your adversary's position simpler and more direct? If you sold 5 grams or less, your penalty remains the same before and after. Justice Sotomayor, because that interpretation doesn't fit within the text of 404A, because when you read statutory penalties in context, it doesn't refer to the sentencing range. It can't, because Section 2 didn't modify any sentencing ranges. All it did was raise the quantities, and that affected everyone in all three tiers, because it changed the benchmarks for sentencing. Now, we didn't mean to say that the language was unambiguous. All I meant with the Chief was simply that it was unambiguous that Section 404 is limited to crack offenses. As for statutory penalties, we think it's unambiguous when you read it in context, including the eight years of the Sentencing Commission referring to the phrase statutory penalties, as we do, to refer to the higher quantities, not lower sentencing ranges. Justice Kagan? Mr. Adler, you've referred a number of times to this anchoring effects argument, which is to say that in changing the categories, it would lead to different kinds of sentences. And I have no doubt that that's true, but where do you find any concern about that in the statute itself? The statute, when it talks about statutory penalties, that means the penalties that are provided in the statute, not the penalties that are actually given by judges because of these anchoring effects. Yes, Justice Kagan. So that's just an explanation for why Congress would have wanted B1C offenders to be covered, just as B1A and B1B offenders are covered. And we see that goes back to really what the overarching goal of Section 404 is, which is to give everyone who is sentenced under the 100-to-1 regime an opportunity to seek a reduced sentence under Section 2's new statutory benchmarks. So if we look at Section 2, Section 2 applies prospectively to everyone sentenced after August 3, 2010, including people without mandatory minimums. Section 404 came along and made that retroactive. Everyone agrees with that. And then we drop down to 404C. Congress told us who it wanted to exclude from Section 404, and the only people it excluded are the people who have already received the benefit, the opportunity to benefit from Section 2's new statutory benchmarks. That includes the people sentenced after August 3, 2010, and it includes the people resentenced after August 3, 2010, and it includes people who have already filed a 404 motion and been denied on the merits. Nobody else is excluded, and that's because Congress wanted everyone sentenced under the 100-to-1 regime to have an opportunity to benefit from those new statutory benchmarks, whether it affected their statutory range or not. So that's where it comes into the purpose aspect of this case. I mean, you make this point about Congress wouldn't have wanted lower-level offenders not to get the benefit of the statute when it gave that benefit to higher-level offenders, but Congress knew that the commission had already made changes that benefited all these subparagraph C offenders except the ones whose sentences weren't calculated by reference to the drug guidelines at all, except for career criminals. So why is it so clear that Congress would have wanted to benefit the career criminals in subparagraph C? Justice Kagan, the same exact thing would be true for the B1A and B1B career offenders as well. So that's not a basis to categorically exclude only the B1C offenders. And as I was explaining earlier, the ratio has the potential to affect everyone, even career offenders, because of the anchoring effect that you alluded to before, and also because it came in through the unenhanced guideline range, which served as an additional anchor for career offenders for downward variances. And we know that from the Sentencing Commission's 2016 report, which documents that empirical fact. Thank you. Justice Gorsuch? I have no questions. Thank you. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Mr. Adler. Do you know what the market value roughly of 3.9 grams was at the time of the offense back in 2008? Justice Kavanaugh, I don't. It was probably, if I had the ballpark, I would say $50 or something around there. Okay. And you've talked several times about the goal of Congress here, and I guess one thing that the questions of my colleagues point out is the text doesn't, at least at first glance, seem exactly in line with that goal, which raises the question, why didn't Congress just say everyone who's been sentenced for crack offenses under 841 is eligible for resentencing, something simple like that? And I realize you can ask that kind of question in almost every statutory case, but here it seems like that would have been the easy way to do what you've described as Congress's goal. What do you think was going on there? Right. Justice Kavanaugh, so the reason it couldn't just refer to 841 is because it was also dealing with Section 3, which addressed a different problem with regard to simple crack possession. And I think, you know, I would sort of turn it around and say, well, if Congress wanted to do what Amicus says, then it just would have drafted the exact same statute and just substituted the word amended for modified, and it gets exactly to where Amicus says that Congress wanted to go. So, of course, Congress might have drafted this in an entirely different way, but based on the statute we have and the two competing interpretations that are in front of the court, our interpretation is textually sound when you read the phrase statutory penalties in context, and that's the fundamental flaw with Amicus's theory. And your in-context point, I think, ultimately rests on this idea that sentencing judges will be affected, as you put it, I think, by changing from four-fifths of the mandatory minimum amount to four-twenty-eighths of the mandatory minimum amount. Is that one of the things you're relying on? That is the background of how discretionary sentencing worked under 3553A. When I mean in context, I mean the actual statutory language, reading it in context, because Section 2 didn't modify any sentencing ranges. So if Congress was drafting Section 404, it would have had the statute book open to Section 2, it would have looked to see what Section 2 actually did, and all it did was raise these two craft quantities from 5 to 28 and 50 to 280 in two particular statutes, 841B and 960B. So then Congress would have opened the statute book to those statutes, and the first thing it would have seen were the headings entitled penalties. It would have done the same thing for Section 3 or seen the same thing, penalties. And so the statutory penalties language is just a shorthand reference for the penalty statute. Do you think someone would have, though, after about ten minutes, said, well, what about those C offenders? No, Justice Kavanaugh, because all Congress was doing here was trying to make Sections 2 and 3 retroactive for everyone sentenced under the 100 to 1 regime. It wasn't sort of slicing and dicing up subcategories of craft offenders. Thank you. Justice Barrett? So, Mr. Adler, let me just pick up right there. Is your position essentially then that penalty is kind of a shorthand that pulls in, and Justice Kavanaugh alluded to this, everyone who was sentenced under the prior craft cocaine disparity? Yes. Yes, Your Honor. That is our position. That seems pretty sweeping. I mean, the word penalty, and Justice Alito was pointing this out, that would give penalty a different meaning here than it has anywhere else in the criminal code. But that's right. You say in this particular context, that's what it means. Yes, Justice Barrett. That's the only thing it can mean because Section 2 didn't modify anything else, and that's exactly how the Sentencing Commission referred to it repeatedly over the eight years leading up to Section 404. It referred to it that way in the reasons for Amendment 748, 750, 759. Congress approved all of those amendments. The Commission referred to it that way again in its 2015 report to Congress on the impact of the Fair Sentencing Act. Okay. Let me interrupt you there, Mr. Adler, and ask you a different question. So, if someone is resentenced who had been convicted under Section B1B, and let's imagine that they had had, you know, 20 grams when they were initially sentenced, and they're resentenced under the new ranges, is it true that they would have to receive a new sentence? There would be no discretion. Statutorily, they would get to receive a new sentence. No, Justice Barrett. This is all discretionary. You're right. Sorry. I didn't mean that. I just meant it wouldn't necessarily kind of bump them down. I guess what I'm trying to get at is it seems to me that the thrust of your argument under C is this benchmark idea, that it's not necessarily the case that they were entitled to a different range, but it's all about what the judge would look at as benchmarks. And I'm trying to get at would that be different under Sections A and B? No, Justice Barrett. The exact same dynamic would apply there. Some of those people might have lower statutory ranges today, but not necessarily all of them. If you think about the kilogram offender and, you know, if he was charged today under B1N, he would have the same statutory range. That's not what Congress was getting at here. If Congress was only concerned about people who definitely have a lower range, they would have targeted the people that have between 5 and 28 and 50 to 280 grams, and we know that's not who they targeted because the kilogram kingpins are included as well. And, of course, 404C makes it abundantly clear that this is all discretionary. Nobody is entitled to a reduction here. That's the last sentence of 404C. Congress could not have been clearer about that. Thank you, Mr. Adler. A minute to wrap up. Mr. Adler? Thank you, Mr. Chief Justice. The 100-to-1 disparity permeated the sentencing regime. It not only affected the statutory and guideline ranges, it also affected the 3553A determination. The quantities in the statute reflected Congress's judgment about how much crack was needed to trigger 5- and 10-year mandatory minimums. So those quantities provided the frame of reference through which all crack offenses were viewed. In Section 404, Congress sought to eradicate the stain of the 100-to-1 disparity. To ensure it did not warp any one sentence, Congress gave everyone sentenced under it the opportunity to seek a reduced sentence under Section 2's more favorable benchmarks. The only people Congress excluded in Section 404C were those who already received that opportunity. Categorically excluding B1C offenders would leave the taint intact for those with the smallest quantities. Had Congress intended such a perverse result, it would have said so loudly and clearly. Thank you. Thank you, Counsel. General Sagan? Thank you, Mr. Chief Justice, for the promotion, and may it please the Court. I'd like to address the two main concerns that have come up in the argument thus far. First, the statutory penalties can't possibly refer to punishment. Even the amicus agrees on that. Or else Section 404 really does nothing. Justice Thomas, your statement was good as far as it goes, but you could also substitute the A and B requirements, and the statement would remain equally true. So we're talking here about moving around quantities and thresholds of crack cocaine. Second, I don't think there's a concern about resentencing or sentence reductions for every drug, because the non-crack offenses aren't violations that were modified. In construing terms like modified, like in connection with, related to, this Court looks at statutory design and context, and it should do the same here. Thank you, Deputy General. In this case, the Department switched its position from being the respondent to supporting the petitioner. Prior administrations have done that. Subsequent administrations are going to do that. But I wondered what standard your office applies in deciding when to take that step. Is it just that you think the position is wrong and you would have reached a different one? Well, Your Honor, I don't know that we have a specific set of procedures or guidelines that I could kind of publicly share. Let me just say that in this case, very much due consideration was given to this within the Department, and the Department determined that the prior position wasn't as sound as the position that we're advocating now. And I think we focused on three factors. One is the language is a very good fit for what Congress was trying to accomplish here, which is to try to identify the group of offenders whose sentences might plausibly have been affected by the discredited racially disproportionate 100-to-1 ratio. Second is that retroactive guidelines relief just isn't enough for most of these people for all the reasons explained in our reply brief. And third, it's really hard to justify why you'd include every A and B offender and not include a single C offender. Mr. Fagan, is there any respect in which you disagree with the petitioner's position? I think that we identified some things we were concerned about in petitioner's position in our opening brief, Your Honor, and petitioner appears in the first few pages of his reply brief to have come around to basically the position that we were advocating. So, assuming I'm understanding his position correctly, I don't think there's much daylight, if any, between the two of us. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Fagan, you suggest that there's no real difference between A, B, and C. But what's changed in A and B? Your Honor, to the extent anything has changed in A and B, like to the extent that- No, just in the language. There was an amendment to A and B to the drug quantity thresholds for- Okay. Now, what language changed in C? No language changed in C, Your Honor. But, of course, C is textually linked back to A and B by the acceptors provided otherwise in A and B. Okay, but in a sense, A and B are linked, too. But the language changed, the amount changed, but the language in C did not change, right? That's right, Your Honor. Although, on this point, I think it's quite relevant that Congress did not use a word like amended, which it would have been well aware was a word it could have used because it appears in- So what's the difference between modify and amended? I think modified has a broader connotation, and Congress used it deliberately because it's not the language of Section 2 of the Fair Sentencing Act, which we know it was looking at.  Let's say, for example, that Congress eliminated all charges of possession with intent to distribute but left simple possession available. Would you say that the elimination of possession with intent to distribute, thus forcing more pressure on the possession, the simple possession charge, would you say that that has modified the simple possession charge? Maybe, Your Honor, but I think we're much closer here due to the textual and practical interconnect. You could imagine that the quantities could have been codified in C and B, where A just kind of tracks whatever quantities were in those. Well, I'm sorry, I'm out of time, but I don't understand the difference. If simple possession isn't modified in my example, I don't see how C is modified because A and B, the changes in A and B put pressure on C. I just don't see it. But anyway, thank you. Justice Breyer? I assume with me that you have a statutory argument that is a plausible reading. I don't think the better reading, but a plausible reading. Now let's take Mr. Terry, who is a career offender. I take it. He had several prior convictions for drugs. And we look at C. And when we look at C, and this is before the modification, we look at C, we see that he possessed with intent to distribute. He had prior convictions for the same thing. And therefore, he falls within the second sentence, 30-year maximum. Then we look to the guidelines. The guidelines say a career offender, that's what he was, is sentenced at level 34, category 6. Okay? Now, he was sentenced at level 34, category 6, with some modifications to get the sentence down. That's a very high level. Now let's imagine Mr. Terry being sentenced exactly the same way, after the change. Why would there be a difference? The only difference could be in the propensity of the judge to depart from the guidelines, to depart downward. And I don't see why. This statute punishes people who are career offenders, as applied to him. Whether it's methamphetamine, whether it's cocaine, or whether it's crack. And why would the sentence be different, the one from the other, in respect to drugs, whether it's one drug or the other? The guideline in 4B, you know, career offender guideline, is the same for both. So I don't see how in an ordinary case anything would change. At least as applied to career offenders. Please explain to me how it would change, and why. Sure. Three points, Justice Breyer. One is that although the career offender guideline hasn't changed, the drug quantity table has changed for crack. And much more dramatically now... Let me interrupt you right there. The quantity table has nothing to do with career offender guidelines. The career offender guidelines are totally separate. That's true as a formal matter, but of course we and Petitioner both cite the 2015 commission report to Congress. Oh yeah, we hated it. I understand that. They hate it. Of course they're right. But I'm looking at what Congress did. Not what we say maybe they should have done. Your Honor, the report indicates that judges, as an empirical matter, often depart downward because of the disparities. All right. I'm asking you why would they depart downward more if the underlying drug is crack than they would depart if the underlying drug were cocaine straight or methamphetamine. That's my question. I think the relevant question here is they've now grown much, much further apart, and I think judges would be entitled to take that into account. Justice Alito? Let's think of some statutory violations that could have been prosecuted under A or B before the modification. These are cases where the drug quantity is just over the amount needed to invoke the mandatory minimum. If we look at the possible statutory penalty for those offenses before and after the modification, is it not the case that the statutory penalty is different as a result of the amendment of the drug quantity needed for the mandatory minimum? The statutory penalty for that particular offender, if by that you mean punishment, would be different for him. But, of course, the amicus's position would allow relief for all B and A offenders. If you look at the Venn diagram on page 9 of our reply, there's no dispute that the outer two solid areas, even though they'd be subject to the exact same penalties today for their quantities, would nevertheless be eligible to seek sentence reductions under section 404. But is it the case that there are violations, namely the ones I just referred to, under A and B for which the statutory penalties were changed as a result of the modification? Is it not the case that there are no such cases under C? No case prosecuted under C has a different penalty as a result of the modification. Well, two points to that, Justice Alito. One, if by violation you mean a specific offender's conduct, then yes, there are going to be some in A and B, and everyone in C is subject to the same term of years incarceration. But I guess the second point I would make is that C, by its nature, as interlinked with A and B, has changed. It's now not just the offense that punishes 0 to 5 grams. It's the offense that is the exclusive punishment for 0 to 28 grams. Thank you, Mr. Fagan. Justice Sotomayor? Mr. Fagan, you don't disagree, do you, that no one but crack cocaine users are covered by the Fair Sentencing Act? No other convicted felon with respect to heroin or any other drug is covered? Under the provisions that we're talking about today, the Fair Sentencing Act was addressing crack exclusively. All right. Number two, am I correct that every felon who is convicted under subdivision A and B, whether they were convicted above the guidelines, below the guidelines, above the statutory minimum, or not, that were changed, every felon got an opportunity if they chose to be resentenced, correct? I believe that is correct, Your Honor, yes. So we're talking about, one of my colleagues asked, does this mean that what we're advocating is that every subdivision C felon be given the opportunity, they may not necessarily be resentenced, but all we're asking is equal treatment, correct? That C felons, subdivision C felons, be given the opportunity to be resentenced, correct? That's correct, Your Honor, the C crack offenders. Now, counsel, do you have some estimate of those numbers? Your Honor, it's hard to know precisely because it's not tracked to an especially granular level, but the best estimate we have is it's in the low three figures, something like 100 to 200. All right, so with respect to that, there have been some people who, if we were to rule against you and petitioner, who have already been resentenced, what would happen to those people? Would you have to go back and then give them their original sentence? Because there are some circuits who have read it the way you do read it now, these provisions now, correct? That's correct, Your Honor. There is a circuit conflict on this. I don't know that anyone who has received relief under Section 404 wouldn't be eligible to seek such relief again. We do think that in the circuit— That's not my question. If we rule against you, those people who have resentenced, will they be resentenced? Will you go back to their original sentence? I don't think that there is a mechanism for doing that, Your Honor. So I think they would have obtained a windfall, I suppose, based on what this court later determined was a misinterpretation of the law. So now there's even a smaller group of people who are going to be denied the opportunity. Thank you, Counsel. Justice Kagan? Mr. Fagan, I'd like to take you back to your conversation with Justice Alito and read to you a sentence from your own brief, where you say all crack cocaine defendants sentenced under subparagraph C, post the Fair Sentencing Act, are exposed to the same statutory range as before. So that's correct, right? I hope so, yes, Your Honor. Okay, and then you could not make that same statement as to A or B, isn't that right? That's correct, Your Honor. And what you seem to be arguing is that in A or B, you couldn't make that statement, because some of the A or B people, in fact, are now subject to a different sentencing range, but some aren't. And you're saying, well, if those A and B people who are not subject to a different sentencing range are getting the benefit of this law, why shouldn't the C people, too? Is that basically what you're arguing? I think that's one piece of our argument, Your Honor. I think what I want to ask about that piece is, isn't that just a function of the categorical approach at work in this statute? The reason why some A's and B's are getting the benefit of it is because the statute works categorically, and there's nothing mysterious about that. But the C's are out in the cold because nobody's sentence is affected. Well, Your Honor, let me make two points in response to that. The first would be that just looking at it categorically, I do think the offense has changed because it's really just mirror images of one another. The B defendants who are no longer eligible to be B defendants have to go somewhere, and they go into the C range. So that's just kind of they necessarily correspond to one another. The second point I would make is that, as this court recognized in Dorsey, the statutory changes, everyone understood them to affect the statutory penalties for C because, as this court explained in Dorsey, the mandate that the Sentencing Commission conform the guidelines to the statutes necessarily was expected to include modifications for even the low-level C offenders. And if you look at page 15 of our reply brief, you'll see how dramatic those changes were. Thank you, Mr. Fagan. Justice Gorsuch? Thank you. I have no questions. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Mr. Fagan. How do we take into account the reality of sentencing as against the statutory language in this case? I think Mr. Adler said, and I think this is correct, that sentencing judges, many sentencing judges, will think about this differently when it's four-fifths of the mandatory minimum versus four-twenty-eighths of the mandatory minimum, and that will have an effect on how they exercise that discretion. I think that's true in many cases, but then how do you link that up to the statutory tax? Well, Your Honor, I think the way we link it to the statutory tax is an important consideration to keep in mind is two main reasons. One is that statutory penalties, I think, again, the amicus agrees on this, has to refer to the shifting of the ranges. Not to modification of any term of year sentences because, of course, the Fair Sentencing Act didn't do the latter thing. So we're already in a world where we're talking about shifting ranges as changed statutory penalties, and that shift is illustrated on page seven of our reply brief, and it's quite dramatic. The second linkage I would point the Court to, as I was just discussing with Justice Kagan, is the Court's opinion in Dorsey where it was well understood and, in fact, a reason for the holding in Dorsey that the statutory changes were going to necessitate changes to the guidelines to conform with it, and you don't have to take my or Mr. Adler's word for what a judge would normally think if he's looking or she is looking at a zero to twenty-eight range. Well, I'll end there. Thank you, Mr. Fagan. Justice Barrett? Mr. Fagan, I want to be sure that I understand the distinction between your argument and the petitioner's argument, at least in the petitioner's opening brief. So the petitioner's opening brief cast this scheme as floors and ceilings, kind of suggesting that anything that was below, in the old scheme, five grams, which was the limit in B, was necessarily funneled into C, and you pointed out that wasn't correct. Am I right? That's right, Your Honor. Although by ceiling, what we thought was not correct was the use of the term ceiling to imply that the defendant is actually innocent of a C violation if it's more than a certain quantity. If you use ceiling a little bit more loosely to simply mean a cap on the exclusive range, then that's essentially what we're saying and it's a fine term to use. Because, am I right, that one objection you had to that characterization is that those that were sentenced under C weren't necessarily those who had less than five grams, but it could have been someone who had 200 grams, but was just charged under C instead. That's correct, Your Honor, and sometimes you even have defendants who plead to much higher amounts, but they're still sentenced under C. Okay, and then my other question is, did you view the government's prior position, when you changed, you changed pretty late, it was the day your brief was due, would you characterize it as implausible or is it your position that the statute is ambiguous and that in light of the purposes of the First Step Act and the Fair Sentencing Act that yours is the better interpretation? The latter, Your Honor. I don't think we're taking an implausible position before, although we think it's ultimately unsound for the reasons in our brief and primarily the reasons I was just explaining to the, I was trying to explain to the Chief Justice. Thank you, Mr. Fagan. A minute to wrap up, Counsel. Thank you, Mr. Chief Justice. The First Step Act finishes the job that the Fair Sentencing Act started of erasing the taint of the racially disproportionate hundred to one ratio. It therefore allows courts to consider what a cracked defendant would have looked like if he fell within a modified statutory class of offenders with a wider range of culpable conduct. Even after the retroactive guidelines changes, for the reasons explained in our reply, not every low-level crack offense is going to still look the same in relation to a 28-gram threshold as it did to a 5-gram threshold. Congress didn't foreclose every offender under C from at least getting a look, and then the court that looks at the Section 404 motion can decide whether in the exercise of its discretion a reduction is in fact warranted. Thank you. Thank you, Counsel. Mr. Mortara? Mr. Chief Justice, and may it please the Court, my friends are making changes to the statutory text in Section 404A, different ways of cloaking the same point. The government wants to talk about a penalty scheme. My friend, the public defender, says we should look at penalty statutes. Both have converted the noun penalties in Section 404A into an adjective, because they cannot address that the noun penalties means punishments, and we are not looking for a changed penalty scheme or a changed penalty statute. They argue that because more people will fall into the ambit of 841B1C after the act, that somehow changed the penalties. But I want to explain how it is in fact that Section 2 and 3 of the Fair Sentencing Act modified statutory penalties, and I want to do so by reference to Mr. Dorsey of Dorsey v. United States. He sold 5.5 grams of crack in August of 2008 and was sentenced in September 2010 as an 841B1B offender. That's what he was convicted of. He got a 10-year minimum because of a prior conviction, and the statutory minimum was eight years of supervised release. He came to this court, and this court he sought sentencing under 841B1C more lenient penalties, and this court gave it to him, modified his statutory penalties. What the FIRST STEP Act does is it extends that retroactive treatment, committed crime in 2008, sentenced in 2010, to everyone who was sentenced before August 3, 2010, and that is all it does. I welcome the court's questions. Counsel, I think you know the basic problem in terms of practical effect, as the people are seeing with respect to your interpretation, and that is that defendants under A and B get a new sentencing, and indeed their sentence can be reduced at time served. But under C, the least culpable offenders, those people can't. Now, I understand if you're right about what Congress said, that's what they said, but why would Congress want to implement that result? To the extent that the drug quantity had an influence on a subsection C offender's sentence, that was through the drug quantity tables, as Justice Breyer observed, and those subsection C offenders got revised sentencing because of the retroactive guidelines amendment the Commission put in place almost immediately after the Fair Sentencing Act. Well, I understand that point, but I think it's a little curious to say that Congress did something that really makes no practical sense because they felt sure that the Sentencing Commission was going to deal with it with retroactive guidelines. Well, I don't think it makes no practical sense, Mr. Chief Justice. Earl Dickerson of Massachusetts received a mandatory life sentence under 841B1A because of his prior convictions exclusively because of the crack-to-powder ratio. He had 57 grams. After the First Step Act, his sentence was reduced to 206 months. That makes perfect practical sense. He was stuck because of the statutory minimum penalties. Section 2 modified them for him. The First Step Act made it retroactive. But there is a vast number of people that were sentenced under C who will not get any result under the First Step Act, but they're relegated to whatever relief they get under the sentencing guidelines, right? And those would be career offenders for whom the crack-to-powder ratio had no influence whatsoever. The other side suggests, and maybe I'm mistaking the point, but that there's no spillover, that these changes that we're talking about apply only in the cocaine context, and even though the provisions we're talking about are not limited to cocaine, that the provisions of the First Step Act don't have any broader effect. Is that right? I think that's an instance of two wrongs making a right. If you take the first atextual turn and turn statutory penalties into penalty statutes, they're just inviting you not to take the next turn and imply that to all drugs, but that's the necessary implication of what they're saying. The problem that a number of people have pointed out is the anchoring effect, which would result in people whose sentences can't be changed under C really being prejudiced. I think it is... You don't challenge the basic logic of the fact that if your sentence is zero to five and you have five grams, many judges are going to give you a sentence near the maximum, but if for the same possession, zero to five, under the new ranges, you know, the maximum under C, but the range before you hit B is 28, and a judge is going to look at that and say, well, you're pretty close to the bottom of the range, and so you're going to get a smaller sentence. That seems to me to be incontestable as a logical matter and a consequence of your reading. Well, what I would say first and foremost is I haven't found any evidence of any judge ever saying, I am doing this, and I haven't found any evidence of any first step act resentencing where a judge has said, I think this is what happened in your original sentencing, even sometimes the same judge, but accepting that it's incontestable, it is not a modification of a statutory penalty. 404A says statutory penalties. What you're talking about is an extra statutory effect. Thank you, counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Mortara, the government and petitioners seem to be arguing that the changes to A and B somehow have resulted in a modification of C. Could you comment on their arguments? All I can say is that as I think you and Justice Breyer have observed, the penalties in C did not change, and penalties means punishment. My friend, the public defender, has asked the court to adopt a technical meaning or a meaning at odds with ordinary meaning for statutory penalties by referencing the subsection title for 841B, which is penalties. This court has repeatedly rejected such an approach, including in the Castillo case, which is a decision from this court interpreting what is and is not an element in a federal criminal statute. You were, at one point in your discussion with the Chief Justice, about to make the distinction between the effect of the quantities on sentencing as opposed to the career status of the defendant. Would you finish? You were about to make that distinction. Could you do that again? Sure. I think actually Justice Breyer made that distinction very capably, which is that someone who is under the guidelines class as a career offender, the drug quantity no longer has any guidelines influence on the range they receive. It's a completely separate table. I do want to point out that there are recidivism enhancements in the statute that can, because of the ratio, force people like Earl Dickerson into a mandatory life sentence under 841B1A by statute. The Fair Sentencing Act did nothing for him. The First Step Act did everything for him, and it makes perfect sense. But if you have a significant change to the practical application of subsection C, why wouldn't that be seen as a modification, as I think Petitioner argued? Well, I think it would be the same thing as the idea of someone narrowing the scope of, say, second-degree murder, that does not change the statutory penalties for second-degree murder any more than moving people around changes the statutory penalties for subsection C. Again, and you've mentioned that Petitioner made a point of arguing, I think the government did too, and you alluded to it a few minutes ago, about the use of the term statutory penalties. And you, I think, dismissed that a few seconds ago by saying that they are changing the language to an adjectival language. But could you address his argument as to what that term actually means? I think it means the punishments imposed by statute, which is what the compound noun would suggest to an ordinary reader of the English language. Thank you. Justice Breyer? Put aside the language for the moment. I want to focus on what the Chief Justice said was incontestable. In my mind, it's totally contestable. Why? And this is where I think we're having trouble. Think of C. There are two sentences in C. I mean, linguistic sentences. The first, a long sentence, has to do with people who are not career offenders. The second has to do with career offenders. Think of the first. Was that person on your reading prevented from asking for a lower sentence? Now, remember, the AUSA thought these high sentences are ridiculous. So the AUSA brought it under C and not A and B and said, we don't know how much drugs there are. But the judge found out in the pre-sentence report and used the table. Can that person challenge his sentence? Yes. Why? Not under the statute, but because the Sentencing Commission reduced his sentence to reflect the change in the First Step Act. So he's free, all those people, to be re-sentenced. Now, what about the second sentence? The second sentence has to do with career offenders. They aren't free to re-challenge because they were not sentenced under the sentencing guidelines having to do with drugs. They were sentenced under the sentencing guideline having to do with career offenders. Those people, really, whether it's cocaine, methamphetamine, or some other drug on Table 1 or 2, it doesn't matter. The amounts don't matter once it's a felony. So there's no reason that they should get to ask for re-sentencing. Now, I just stated something that's in my mind, and I want you to think about it and admit if what I've said is wrong or right or should be modified. Justice Breyer, I think what you said is 100% correct, and I would further point out that reclassifying somebody as a career offender or not is precisely what is occurring in some of these re-sentences. Why is that correct? Why did the government argue what it argued? They know these as well as I do, probably better. Your Honor, I am here to explain many things. The behavior of the United States government in this case is not one of them. Justice Alito? If we write an opinion and we want to define the term statutory penalties as it's used in this provision, can you give me a concise definition, preferably, for that term? Just for statutory penalties, I would say the punishment is available under the statute. All right. Thank you. Justice Sotomayor? Counsel, going in part to Justice Breyer's question, under subcategory A and B, even offenders who had mandatory minimums previously and were career offenders, some of them, their guideline ranges were far above the mandatory minimums or far above the career offender guidelines. Yet, those offenders got the benefit of the retroactivity in the Fair Step Act. They can come in and argue that their sentences should be reduced, even though the original sentence was not controlled by the guidelines or the mandatory minimum or the career offender category. They got a higher sentence. That's correct, isn't it? Your Honor, I have to be clear. Section 404B of the First Step Act requires a sentence imposed as if Sections 2 and 3 of the Fair Sentencing Act had been enforced. There is an active circuit split on what district courts can do in that resentencing. In some circuits, no, the offender that you're outlining wouldn't get any different sentence. All right. There is a circuit split on that, but the government told us everyone was eligible. That's the government's position, correct? Yes. The government, in its presentation today, didn't get the chance to tell the court that it had taken the position that 404B categorically prohibits resentencing people any more than just interpreting the effect of 2 and 3 of the Fair Sentencing Act. It took that position in Base v. United States, number 2535, at pages 13 and 14 of its file. Counsel, there's a bipartisan sponsors of the First Step Act submitted an amicus brief urging us to reject your argument. They say the act was intended to grant all crack offenders another chance at a reduced sentence, and there are people who were sentenced as career offenders who can be sentenced now to a lower amount if the judge so gave them due consideration. Why should we ignore this bipartisan consensus? In the lowest level of crack, the federal defender tells us that the crack amount that this defendant, even though he's a career offender, sold was probably valued at $50. That's not to take away from his criminal history, but why shouldn't we permit him to be resentenced? Justice Sotomayor, I'll again point out that revising somebody's career offender status is illegal under Section 404B of the First Step Act, and the government, this administration, has taken that position in this court in the Base case. I didn't say revise his career offender status, Counsel. I said he was sentenced above the guideline range for that status, and it was above, and why can't he come down to whatever the bottom of the career offender range is? First, I want to get to your question about the Senator's brief. That is for members of one of our two houses of Congress. I don't think it represents necessarily the universal view of those who voted for the First Step Act. What represents that is the text of the statute, and Mr. Terry was sentenced at the bottom of his career offender range. Thank you, Counsel. Justice Kagan? Mr. Murtara, something I think is odd about this whole case and your argument is that the most natural reading of what statutory penalties means isn't really even on the table, because the most natural reading, you'd be looking for a modification of a provision that actually gave a sentencing range. You'd be looking for a sentencing range that went from 10 to 20 to 5 to 15, and there's nothing of that kind in the statute to refer to. So isn't the statute kind of incoherent from the get-go? I don't think so. Justice Kagan, one reason in light of Dorsey. The court's opinion in Dorsey perfectly reflects what Congress is trying to extend to everyone else retroactively. Mr. Dorsey, charged under B, sentenced under C, a different provision with different statutory punishments. Mr. Hill, who was the companion case, charged under A with 53 grams and a 10-year minimum statutory sentence, but was ultimately sentenced under B. His statutory penalties were modified. So read in light of Dorsey, this actually makes perfect sense at both first and third reading. So if I understand that correctly, you're saying there are people who can't be convicted of subparagraph B now who could have been before, and you're right that that's not true of subparagraph C, but you could sort of make the opposite argument, that there are people who can be convicted only of subparagraph C now who could have been convicted of other crimes before. So why doesn't the argument work both ways? For two reasons. Number one, the statute's referring to a violation, a specific violation that occurred at a specific time. That is Mr. Terry's violation, not a group of people. And secondly, for the first-degree murder hypothetical reason, narrowing the scope of some greater crime such that more people can exclusively be punished in some lesser crime does not change the penalties of the lesser crime. Do you agree that there are defendants convicted under A and B whose statutory penalties weren't modified, but who will get the benefit of this act? No, I do not, because anyone convicted under A, the elements were 50 grams or greater, that only supports the conviction under B today. Their statutory penalties were changed. They may not receive a sentencing reduction because under 404B it may be determined, based on what quantity was in, for instance, the judge finding or the PSR, that they were ineligible for any such change, but that's a 404B question. And let me make sure I understand that. I mean, do you think that you use the categorical approach in A and B? Yes. So doesn't that mean if you use the categorical approach that there are some A and B offenders whose penalties would not change, but yet will get a re-sentencing? No, because we look to the elements of an A charge and a B charge. The quantity element of an A charge is 50 grams or greater. After the Fair Sentencing Act, that threshold changes such that that element can only support a B charge. Thank you. Justice Gorsuch? I have no questions. Thank you. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Mr. Martara. Picking up on Justice Kagan's questions, if the statutory text is ambiguous given the cross-reference, it seems to me that the other side is asking us to look at a few things, or maybe there are a few things that could be considered in how to think about this statute. I just want to get your reaction to these things. One is the relatively small amount. Justice Sotomayor alluded to this. I asked about the cost, $50, and assume it's a few hundred dollars. It's still a low amount that we're talking about here, not the kind of situation that I think most people have in mind when they think about lengthy sentences for federal sentencing. So that's one. Two is the history of the disparity, the crack powder disparity. This all kind of stems to June 1986 when Len Bias died, and that was a shocking event, particularly in this area, particularly for those of us who was a year younger than he was, looked up to him like everyone in this area did, and that was a shocking event in this area and ultimately in the country at large and prompted Congress, along with other things, but that was really the proximate cause of Congress moving to establish the 100-to-1 ratio, even though that was a powder situation in the Len Bias situation, the 100-to-1 disparities ushered into the law. And then there are racial disparities, of course, that develop over time, and Congress really has been working now for 35 years hearing about this and working to claw that back. So that's something we should be thinking about, I think, the other side would say. And then the third, which we've touched on, is the reality of sentencing judges and how they really, in practice, I take Justice Breyer's point that some of them, in some cases, are going to think differently about this when they're close to the limit, the 5, versus not close to the 28. So those three things together, to the extent the statute's ambiguous, low amount, the history, the racial disparities, and the reality of sentencing, and you can take whatever time you want to answer those. Thank you, Justice Kavanaugh. As to the low amount, as we've spoken about before, Mr. Terry's sentence was dictated by his career offender status, and I should point out that the First Step Act did make statutory modifications to the recidivism enhancements, changing drug felony to serious drug felony in such a way that I do not actually think Mr. Terry would, if he were to commit his crimes today, be sentenced as a career offender under the First Step Act, but Congress didn't make those changes retroactive. And so I think some of the impact you're talking about is the impact of the career offender enhancement, which is true for all drugs and has been altered by Congress prospectively in the First Step Act. As to where this all comes from and the policy that you were discussing, I can only say that I quibble with the premise that the statutory text is ambiguous. I don't think that it is. And the policy here is more than adequately explained by the people left out of the Fair Sentencing Act initially, people like Mr. Dickerson, who I've referred to repeatedly, who got statutory sentences that the commission could do nothing about. That's not Mr. Terry. Mr. Terry's sentence is very long because, like a small amount of methamphetamine dealer who's also a career offender, career offenders get long sentences. As to the practice, as Justice Breyer put it, what the Chief Justice called incontestable, Justice Breyer found incontestable. I also find incontestable that judges were awarding higher sentences because of these statutory thresholds during a time when for over a decade the commission and others had been wildly critical of the crack-to-powder ratio. I do not think that is true, and I've seen no evidence of it. Justice Barrett? Good morning, Mr. Matara. So repeatedly people have asked you about the impact on this, the benchmarks, whether it makes sense for lower-level offenders in C to be excluded, and the interrelationship between the career offender guidelines and statutory minimums and this statute. Is it your position, I mean, you've explained how, for Mr. Terry and some others, their status as career offenders would preclude any change being made to their sentences by virtue of the First Step Act. Is it your position that there's no one who's left out in the cold who is sentenced for a C crime, B1C crime, who now can't take advantage? Is it your position that they're all taken care of, or not taken care of, but that they're all stuck because of the career offender or recidivism sentencing provisions? I think 404A excludes all 841B1C offenders from having a covered offense to the extent the ratio impacted their sentence, the sentencing commission took care of them, to the extent that the career offender status impacted their sentence. That has nothing to do with their possession of crack, and it could have just as easily been methamphetamine or another Schedule I or II controlled substance. So there's nobody, really, who's left out in the cold? There is nobody who's left out in the cold. I would say the only person left out in the cold would be someone who would like to take advantage of the First Step Act's change to the statutory recidivism enhancement, but is left out in the cold because Congress did not make that change fully retroactive. So when you say, to make sure that we're understanding the same thing, when I say left out in the cold, I mean nobody who could have benefited even from the shift in the benchmarks that we've been discussing, the practical effects on the sentencing judge. Are you taking that into account so there's nobody who could have even been resentenced and perhaps taken the advantage of the benchmarks? Well, to the extent that someone believes that this anchoring effect exists and that it was real, they, if they're C offenders, are indeed, as you put it, left out in the cold because Congress used the phrase statutory penalties, not penalties imposed because of anchoring effects that may not even exist. And that's true even if they were career offenders? Correct. And there are people who didn't have the opportunity to be resentenced when the sentencing guidelines were amended and given retroactive effect initially? Those would be people like Mr. Terry, career offenders, yes. Okay. And is there any distinction between your position and the position of the Third Circuit in the United States versus Burt? I think at the end of the day, no, because the categorical conclusions are the same. There was some slight difference in logic that is not relevant. Okay. Thank you, Mr. Martara. Do any of my colleagues have further questions for the amicus? In that case, Mr. Martara, a minute to wrap up? I will sum up with the court's words from last Thursday in these javas. A rational Congress could reach the policy judgment the statutory text suggested did, and no amount of policy talk can overcome a plain statutory command. I have nothing further. Thank you, counsel. Mr. Adler, rebuttal? Thank you, Mr. Chief Justice. So let's talk about the text. There are several additional problems with amicus's textual interpretation that haven't been brought up today. First, he's effectively requiring this court to insert the word effectively before the word modified. Because Section 2 didn't change the ranges, he's asking the court to say that it effectively modified the ranges, and that's just not part of the statute. Second, his interpretation is inconsistent with the past tense, were modified. His argument depends on defining the violation as a pre-Section 2, 50, and 5-gram offense, but no statutory penalties for those offenses were modified by Section 2 because the Fair Sensing Act applied only prospectively. So his interpretation is inconsistent with the past tense. Finally, something that occurred to me. His interpretation would categorically exclude all pre-apprendia offenders because none of them have 5 or 50 grams as an element of their offense when they were convicted, and there have been 200 to 300 pre-apprendia offenders who have obtained relief under Section 404, and they would have all been excluded under amicus's view. Finally, amicus referred several times to Dorsey, and at one point said that our interpretation of the language would sort of do violence to the English language. Well, I refer the Court to Justice Scalia's dissent in Dorsey, and he repeatedly used the phrase statutory penalties to refer to something other than a sentencing range, just as the Commission did for the eight years leading up to Section 404, and I think Justice Scalia had a pretty good grasp of the English language. Second, on the history, amicus really did not say anything at all about the Sentencing Commission, and all we're saying here is that Section 404, like all other statutes, must be interpreted in light of the historical context in which it was enacted, and Section 404 was just the latest part of an ongoing dialogue between Congress and the Commission, so it would be improper to read 404 in isolation from that context. On the career offender point, that's just a red herring in this case. There are A and B offenders that were also career offenders, and they were fully eligible for relief under Section 404, so that cannot be a basis for excluding B1C offenders. And career offenders, the only reason that they are different here is because their guideline range was not determined by the 100-to-1 ratio, but as we've explained throughout, the 100-to-1 ratio had the potential to affect them nonetheless through the 3553A calculus. And downward variances are commonplace under Section 404 for career offenders. And finally, in response to the Chief Justice on why would Congress do this, this Court looks to the text, of course, and that's paramount, but at the same time the Court doesn't interpret statutes in a way that makes no sense, and all my friend could say was, well, there were people that received a mandatory minimum penalty. That would be a handful of people, so that's just an implausible interpretation. Section 404 covers all offenders who were sentenced under the ratio. The purpose was to ensure that everyone sentenced had the opportunity to seek a reduced sentence under Section 2. That includes the kinkpins, and it includes the low-level dealers under B1C. The judgment below should be reversed. Thank you, Mr. Adler. Mr. Mortara, this Court appointed you to brief and argue this case as an amicus curiae in support of the judgment below. You have ably discharged that responsibility, for which we are grateful. The case is submitted.